May I please the court? My name is John Klein. I represent Mr. Chung, the appellant. I'd like to reserve three minutes for my rebuttal, if I may. This is a criminal case, and it's a case that has a lot of smoke, I would call it. What's lacking is the fire. May you help me on a question about the fire? The real question, it seems to me in this case, is what happened within the five years covered by the statute that the statute of limitations allows for proof of the crime? I agree. If he's like Alger Hiss, who was a spy, or whatever they charged him with under the Espionage Act, but it was all before the five years, so all they could get him for was perjury, that's one thing. But if he was spying during the five years, it's another. Now, it looks as though there were some records that he downloaded some Boeing specs between September and November of 2003. The time stamps are September, October, and November of 2003. I can't see why he would be downloading specs, and that's within the five years. And I can't see why he'd be downloading specs unless he was still spying. What's the answer on that downloading? A couple of answers, Your Honor. First of all, the specs that you're referring to are SDS documents. They're the Shuttle Drawing System documents. They are not the trade secrets that are at issue in this case. In addition to that, there is no evidence at all that he took those documents with him to China. There's no evidence he traveled to China after the downloading of those documents in late 2003 and early 2004. There is no evidence, for example, in his correspondence. There's no evidence in his diaries. There's no evidence, period, that he took those documents with him to China. Was there any innocent explanation for the downloading itself? It's the same innocent explanation, albeit a question. The jury might infer that he downloaded them because he was going to be going to China and wanted to take them with him. And as for the absence of evidence, the jury might wave it away by saying, well, gee, you don't want to take Polaroid pictures of yourself committing a crime either. I would say two things about that, Your Honor. The first one is, if there was a crime here, Mr. Chung did take Polaroid pictures in that he wrote in his diary virtually everything that he did. He maintained correspondence going back many years. But still, what is the innocent explanation of why he would be downloading those specs in 2003? The innocent explanation in the record, and the only one in the record, is that these all related to the space shuttle. He was an expert on the space shuttle. And the innocent explanation in the record is that he was planning upon his retirement to write a book about the space shuttle, and he wanted the records for that purpose. That is the innocent explanation. One thing that I would point out that undermines any sort of inference of intentionality or bad intent, merely from the downloading of records. The first contact Mr. Chung had with the Chinese in the sense of them asking him for information was in 1879. That was the Professor Gu correspondence that's the subject of one of the issues that we've raised. Where Professor Gu asks him for certain information, and Mr. Chung provides it. No allegation that it was a trade secret or classified or anything else. It was basically coarse materials. But that was 1979. Mr. Chung was collecting documents from his work as far back as the late 1960s. All through the 60s. Well, he also retained them, which he was not allowed to do. He had some 300,000 documents at his home, none of which were supposed to be there, and at least a few of which a jury reasonably could conclude were trade secrets. And I wonder why there isn't enough evidence to permit a jury to infer that his earlier intentions to benefit China by revealing information did not continue. In other words, a state of mind can continue. Well, I'll focus in, Your Honor, on the economic espionage counts. What he has to be doing there is intentionally and knowingly providing trade secret information to China. So look at that past conduct. Look at what he did in 1979 with Professor Gu. 1985, he gives a lecture in China on the space shuttle. 2001, he gives another lecture on the space shuttle. And in between, he provides those structures, manuals that are referred to, I think inaccurately, as the B-1 bomber manuals. There's that course of conduct. Throughout that period, in all of those exchanges, which he, by the way, meticulously documents, so there's no concealment over here, in all those exchanges, there is no trade secret information being provided to China. But in 2006, he's discovered to have some documents that include trade secrets. Your Honor, you're right. Out of those 300,000 documents, there are six that are, there is sufficient evidence to conclude that they are trade secret. It was contested at trial, but there's sufficient evidence to conclude that those are trade secret documents. But the question is, what is the evidence that, beyond a reasonable doubt, non-speculative evidence, that in September 2006, Mr. Chung possesses those six trade secret documents with the intent to benefit China? Which is why I asked about the inferences that are permissible from past conduct. Intent is not normally something that people announce in the usual way. It has to be inferred. I agree with you, Your Honor, and that's why when I speak about that past conduct, what I'm talking about is what he actually did. And what he did, the evidence shows, in 1985 and 2001, was give briefings on the space shuttle. And the briefings that he gave had no trade secret information, no export-controlled information, and no classified information. He provided the structures manuals, the B1 manuals to the Chinese. No classified information, no trade secret information, no export-controlled information. He answered certain questions in response to what the government calls the Nanchang Tasking List from 1985. No trade secret information, no classified information. Can I ask you something about what trade secret information is? I beg your pardon? Let me ask you something about what trade secret information is. Yes. Part of how you determine that something is a trade secret is whether the company tries to keep it secret. Yes. And we have a lot of efforts by Boeing to try to keep information secret. There are various other ways, but I have a conceptual problem. I can imagine that Boeing might have a lot of documents where any competent engineer would eventually be able to come up with the same specifications. But it would take many, many man hours of work in order to develop the specifications, just an awful lot of computations and analysis. Can documents like that be trade secrets because the one company doesn't want the other company to be able to steal the work? Even though it could do it itself, it would take longer? I think the unfortunate answer is it depends. A trade secret does not include information that is ascertainable from public sources. And a great deal of what Mr. Chung provided is ascertainable with how much effort. I mean, a lot of us actually pay money to companies for information that is obtainable through public sources because it would take too much time and effort to obtain the information. That's true, but I don't think that is trade secret information, Your Honor. In this case, the information that Mr. Chung was shown to have provided was characterized, certainly by the defense experts and even in many instances by the government experts, as the type of information that you could get from a graduate level textbook or from technical publications. That was not trade secret information. And I might add, Your Honor, the government never claimed that it was. There were only six documents in this case that were ever shown to be trade secret information. The four phased array documents and the two Delta Ford tail service mess documents. And those documents, they were never requested by the Chinese in any of those so-called tasking lists. They were never written about by Mr. Chung in his diary. There's no evidence they were ever provided to the Chinese. There was no discussion of them anywhere. They just didn't figure into what he was doing at all. Your Honor, going back to your point, of course you look at his past conduct to determine his intent. But that past conduct does not include any sort of a trade secret violation. Why does that matter? Because the intent at issue is the intent to assist a foreign country by giving them the trade secret. So let me just use a more far-fetched example. You know, for 30 years you've helped a country in every way possible, and you've said to them on a daily basis, whatever you need, believe me, my intent is to help you in every way possible. So please don't hesitate to call on me if you have anything you need about anything. And that goes on for 10, 15, 20 years. And none of it is criminal, but that intent to be helpful may carry forward to things that are not permissible. And I guess that's why I have difficulty with your argument. I don't understand why the intent to benefit them cannot be inferred even from lawful actions. Here's the disconnect, I think, Your Honor. There was certainly in the 80s, even as late as 2001 when he made the last presentation in China, there was at some level of generality an intent to benefit. Why else would he be giving a presentation to China? Separately, there are in his possession, the government has established by sufficient evidence, six trade secret documents. The problem the government has, and where I don't think they've met their burden of proof, is connecting those two things, because the intent to benefit isn't some free-floating intent. It has to be an intent to benefit by providing trade secret documents or trade secret information. In other words, the intent to benefit has to be... But previously he had supplied documents in addition to just lectures. He did provide some documents, but again, nothing beyond what all the experts ultimately characterized for the most part. There was a debate about whether it was boring proprietary information, but the term proprietary was a red herring in this case. No one disputed that these documents, first of all, were not classified. The ones that he provided were not export-controlled, and the information in them, the experts agreed for the most part, was the type of thing you'd get from a college-level course or a graduate course. He was not providing trade secret information. It's not as if, Your Honor, to take your point about the five-year statute of limitations, it's not as if he had a 30-year history of providing trade secret information. Then he stopped. But he had a 30-year history of being really helpful. Your Honor, if I may just slightly disagree with you, he was helpful. Really helpful makes it sound like this was a man who was just looking at every turn to do something for China. Here's what he did. Here's what he did. In 1979, he sent some course materials from his graduate course to a professor, Professor Gu, the one who didn't turn up until after trial. In 1985 and 2001, he gave lectures on aspects of the space shuttle. In 1985, he responded to some questions that he was given at the Nanjing aircraft facility in China. Again, nothing classified, but he did that. And he provided the structures manuals. That's about five things in the course of a, whatever it is, 25-year interaction with China. That's not like he's looking every day to try to be helpful to China. Was he helpful in modest ways over the years? Yes. Did it violate Boeing policy? Of course it did. And he was fired for that. Is it a federal crime? Does it establish in September 2006 that he had these six trade secret documents with the intent to benefit China, when he hadn't been to China in three or four years, when there's no evidence he ever provided a trade secret to China? No. There just isn't. We do not have the evidence of intent. Isn't that a permissible inference that the jury could draw, though, from his hoarding of masses of documents and his previous activities? With respect, Your Honor, it is pure speculation. Why not? The jury didn't have to believe that he was just collecting all this stuff so he could write a book about the space shuttle. They did not. You're right. They could have believed he was a pack rat. They could have believed he was accumulating stuff for China. Not without sufficient evidence to prove it. Well, the evidence would be he'd done it before. He did not do it before. That's the point, Your Honor. He never gave trade secret information. But he gave lots of documents. And I guess the question, we're looping back to the issue that we talked about earlier, which is an inference to be helpful can arise from things that were not themselves unlawful. And so the question is whether he possessed these things now with the intent to give them to someone who wasn't entitled to have them. And so it's his eagerness or not to be helpful that's really at issue, not whether he was previously a criminal. I agree that that's relevant, Your Honor. And I'm not for a minute saying you don't look at what he did over those many years. Of course it's relevant. But at some point, you cross the line from permissible, reasonable inferences to speculation. And that line is hard to locate. Your cases talk about them. And there are probably cases where the judges disagree among themselves over exactly where that line is located. But in this case, where, you know, Your Honor says, Judge Kleinfeld, you say, well, what evidence is there that he possessed them to write a book? I could speculate about all kinds of reasons that he had them. But it is equally speculative to say that he had these six documents in 2006 at age 74 or 73, whatever he was in 2006, where he hasn't been to China in several years, where he's never given a trade secret to China, to find beyond a reasonable doubt that he possessed them with the intent to benefit China. That's just speculation. It is just speculation. He shouldn't have had them. Nobody can doubt that. He had a generalized intent to benefit China, at least in the past years he had. But that intent manifested itself through lawful conduct. Conduct that violated Boeing policy and got him fired. But it was lawful conduct to infer that he had this criminal intent in September 2006 as to these six documents that no one ever asked for and had no particular significance, as far as the record shows, to China. They never asked for them or lobbied for them or tasked him for them. That's just speculation. And I don't think that's enough to sustain a criminal conviction that put a man in prison for 15 years. We're almost down to your three minutes. I'll save my three minutes. Thank you. Thank you, Mr. Klein. We'll hear from the government. Good morning. May it please the Court. Greg Staples for the United States. I think what I will do is just respond to some points made by my opposing counsel. I should tell you my big concern with the government is direction and control. It would be a nice solid case if during the five years you could show the Chinese government asked for something, he got it in violation of Boeing policy, even though Boeing tried to keep it in the building, and then he furnished it to the Chinese. But it's not that neat. The direction is particularly not neat. It's hard to show that they directed him to do something and then he did it within the five years. So help me with that. The answer, I believe, is he was directed to do it early on and he continued to do it. Years ago. Years ago. Let's assume for purposes of my question that he was a communist Chinese spy in the 70s and into the 80s. Assume it. It doesn't matter because he can't be charged with that. It's all barred by limitations. All he can be charged with is lying about it, which he was, the 18 U.S.C. 1001. What I want to get at is direction and control within the five years. Other than his conduct and continued collect information that was responsive to the earlier requests, I can't cite anything to you. But acting as a foreign agent is, in my view anyway, similar to a scheme to defraud or a conspiracy. In other words, yes, you have to find acts within the statute. I'm sure that it is because of that requirement of direction of control. With a conspiracy, once you join it, you're in it until you get out of it or it ends of its own accord. The Chinese government is still there. I imagine they're still doing espionage. And he's still there. But still there's this element of the crime, direction of control. It's pretty hard to accomplish much in the way of control, but direction would be enough. But I need some direction. Well, I guess my answer is he's a shuttle engineer and worked on a few other projects. But basically he's a stress analyst on the space shuttle. And he is told in 1985 and onwards in the letters that we've presented to the court and in tasking lists, he's asked, we want information on the space shuttle. We want advanced technologies relating to space. My position is once you tell an aerospace engineer you want that, you don't need to come back to him ten years later and say keep sending it. Well, that's a very interesting question of statutory interpretation really because 951D defines an agent of a foreign government as an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official. And so if the person acts as an agent without going through the proper steps, that's a crime. So what you're saying is if you were directed or controlled 35 years ago, you can be found guilty now even if there's no evidence that there's still any direction or control going on. Well, I don't know that there's no evidence. What evidence is there of any direction or control within the statute of limitations? It looks like the last thing would have been in like 1980s. What would be within the statute with respect to the 951 charge would be his collection of the SDS documents. When he was told he was going to be laid off, he downloaded 514. So? Then he went home. That talks to his mindset but not to anybody directing or controlling him at that point. But thereafter, it's in his journal entries, he documents how he's preparing the specs he calls them. He does up the indices for them, which Boeing didn't need. Boeing had an electronic index for its SDS and then hops a plane to China. Where we have no evidence of what he actually did or said to anyone while there, right? We do not. I guess my difficulty is I really understand how that relates to his intent, which goes to the other charges. Because he's busily putting all this stuff together and running off with it and I get that. And that's what I was asking opposing counsel about. But I don't see how that leads to an inference of someone else's state of mind or someone else's act, which is what you're asking us to find. I'll be candid with you. My theory of the case, my view of it is, based on what he was asked in the 80s and 90s, you can infer from that, he was collecting then and he was collecting within the statute, the same types of material in what appeared to be preparation to take to China, that he was acting at the direction of the Chinese government. To me it seems, even assuming that he's a very bad man, and that his great goal in life is to aid the communist government of China at the expense of the United States, even if all that's true, and even if he was collecting the documents in order to give them to China for the purpose of aiding the government of China, and even if it can be inferred from his trip that he probably did give them to China, I still don't understand the direction and control. A person who was disloyal to the United States and wanted to help a foreign power that was a rival of the United States might want to give the foreign power a gift. As far as direction and control goes, it's pretty hard to control an American citizen who's out of the boundaries of China, unless you do like Trotsky, hire somebody to assassinate him, and it's pretty hard to direct him if you don't communicate some direction. The idea that a direction given 15 years ago has some continuing force, gee, I don't follow any directions anybody gave me 15 years ago. I don't think I know anyone who would or does. It's hard to hold together. I cannot give you a letter in the statute of limitations that says, keep up the good work, send us more shuttle stuff. Do you have anything else that I can draw an inference from, other than 15 years ago they gave him a letter, we want this kind of information? I believe the act of the continued collection, organization, creation of index, an inference can be drawn that he's doing that because of what he was asked to do in the past. Why? Isn't it more likely, since they're not asking him anymore, that he just plans to give them a wonderful gift? That is one inference that can be drawn. When people spy based on feelings rather than for money, sometimes it is just a gift. I agree. But again, he initiated this whole course of conduct at the request of Chinese officials. He met with Chinese officials in the United States. But in order to be a foreign agent, sometime during the limitations period, he had to, as I read the statute, actually be a foreign agent and have some direction or control attached to his activities. And so that's my issue. Just speaking for myself, I have no difficulty seeing that in his mind he was being responsive. But I don't really read the statute as just being his mind. There has to be some reality to the direction or control and not just imaginary. So I guess what I'm saying is you'd have to infer not just his actions, but you'd have to infer a continuing 15 years later plus intent on the part of China to be cooperating with him in requesting things or directing or controlling him. And I think that that's not only a reasonable inference. I think it's the most likely one. Why would the Chinese government give up a source like Mr. Cheng? Again, I don't want to belabor the point. He's a shuttle engineer who in the past has given documents and information to the Chinese government. He was given tasking lists and letters that says, no need to limit the scope to what we discussed when we were in the United States. Which is evidence that, which we don't have, but he is meeting with at least one Chinese official on U.S. soil and they're discussing what he's going to provide. When is this now? That was in 1990 or 91. Still outside the statute, granted. Thirteen years outside. Correct. There's nothing more that I can say to you that I believe. Why isn't it a much more probable inference from these facts that he used to act under the direction of control. Now he's an old guy. He's retired. He's an American citizen. Their ability to boss him around is negligible. Whatever he does, he's basically doing gratis. And that his former handler is retired and they figure, well, what he gives us, he gives us. And that's great. But we can't tell him what to do anymore. And we don't. My only response to that can be is, where is the evidence that that is the case? In other words. Well, the passage of time, in many other contexts, we talk about the passage of time carrying with it an inference. For example, in discrimination cases, we'll say, well, if you complained of racial problems in the workplace and you were fired two days later, there's an inference. But if you were fired two years later, there's no inference. So that's, I guess for me, the biggest issue is the passage of time with silence. I understand. I understand. But it's not as if he stopped and then suddenly one day decided, hey, I think I'll get some more stuff together. If you look at the dates of the documents, the phased array documents for the late 90s. Let me give you a different kind of hypo. Suppose I was still in practice and I had a client and they paid me and hired me to do something for them and I did it. It was a nonprofit. And in the course of doing it for them, for hire, I got to like the people there and support their cause. Subsequently, every now and then, I just volunteered to do something for them. They didn't ask me to do it. They didn't tell me to do it. They didn't pay me to do it. Would I be acting under their direction and control? No, you would not. But I assume from your hypothetical that what you were doing was legal conduct. He was engaged in illegal conduct. Well, for direction and control, that element doesn't bear on whether it's not affected by whether it's legal or illegal. It just is a test of whether there's direction or control. I think it's more likely that you're acting in the direction of another country if it is illegal. Why would you expose yourself to that risk? Because he likes communism? Well, I mean, he obviously did because that's why he started in the first place. I can think of any number of reasons. I'm not clever enough to think of a better answer for you. I just believe that you can look at the requests that were made in the past and understand that there was no reason for the Chinese to repeat the request to say, keep sending us information on the shuttle, keep sending us whatever advanced technology you can get. There's just no reason for it. Well, no, there may not be, but one could imagine more circumstantial evidence of visits from someone. One could imagine, or his journal entries talking about someone talking to him. I mean, there's just nothing along those lines that would bolster the continuing validity or vitality of the direction. I understand your position. I don't have anything else to say on it, really. Okay. We've used a lot of your time. I bet there's some other things you'd like to talk about, too. I did want to talk briefly about the issue of what's proprietary and the significance of it in this case. It was not a term used loosely in the trial. The government put on Mr. Hale from NASA, who at one time was a flight director and now is in Washington. He oversees joint space programs with other countries. And he summed it up best. He said the tools for stress analysis are open source. The outcome is not. And the problem that I have with much of the defense's argument when they say stuff is open source, that's not entirely accurate. And I think the court made reference to this. The tools that you use to do it may be open source, but the outcome is not, and that's proprietary. The significance of that, for example, is the briefings he gave in China. Yeah, they weren't classified. They were not export – well, they might have been export controlled, but they were proprietary. And that's the key to the foreign agent charges, that he is providing a lot of information that China could otherwise not get. You can't walk up and knock on the door at Boeing and say, hey, can I see one of your stress manuals? You're not going to get it, because Boeing pays its employees to do that. There was a question about the distinction between proprietary and trade secret. I believe it's just a matter of degree. The court is right. For a trade secret, it's not just that it could be reproduced, but reproduced without much effort. And it's sort of just a spectrum as I see it. But anything that Boeing paid its engineers to put together, and their own expert admitted, you're not going to find it on the library shelf, the B-1 manuals. You can't go to the library and pull out those B-1 manuals. It's not on the net? No. Incidentally, do we have the contents of the 2003 letter from Chung to Gu? We do not. I believe all we have is a reference in his journal that he wrote it, but we never found it. But we don't know what it said? We do not. All we know is he wrote to Gu. Yes. Had Gu just retired? I think he retired the year before, didn't he? Around that time, yes. Why can we infer anything about that letter? Because the only correspondence we have between the two of them that we found all discuss providing technology. No, it's not the only. I think Gu wrote Chung in 1992 saying he'd retired. That's part of the correspondence. Correct. But the other letters talk about providing the technology, about using CHIMAC, another convicted spy. Most of my communications with my colleagues are about cases. But when I took senior status, I got a number of notes from colleagues saying, congratulations on taking senior status. Since he'd had prior communications with Gu about this engineering stuff, and then Gu wrote him saying I've retired, why wouldn't it be as reasonable an inference that when Chung next writes to Gu, he says congratulations on your retirement? Because I don't believe that that was the nature of the relationship between the two men. Their relationship was bound upon what has been termed technology exchanges, although it's a one-way transfer. Your scenario, I'm not going to say is unreasonable, but I think given all of the evidence in this case, I think the more likely inference is that he's still communicating with Gu Weihao regarding technology. One other point I wanted to make before my time runs out is, you had asked what's the innocent explanation, and you were told he was going to write a book. Well, if that's the case, why did he have the trade secret documents on the Delta IV? Why did he have the documents on the X-37, a program he didn't even work on? Why the F-15, the B-52, and the CH-47 helicopter documents, if that's his reason? If that's his reason, why, just prior to the search of his house, did the agents find in his trash, he's taking SDS documents and hiding them within the pages of Chinese newspapers, if what he's doing is all innocent fun, or just an interest in helping his ancestral homeland? I'm seeing no questions from the Court. Do you have anything further for me? I don't believe we do. Thank you very much for your argument, and you have some rebuttal time left. Thank you. Let me just address a couple of points, and then if the Court has questions, I'll be happy to answer them.  Gu Weihao, the alleged handler of Mr. Cheng, retired in 1992. It's ER 1576 is the letter that he writes, in which he says, now this is 1992, Gu Weihao says to Mr. Cheng, I am fully retired this year. Currently, I just stay home without doing much, just practice calligraphy, carve seals, read some books and technical articles to kill time. After that 1992 letter, there are no further correspondence found in Mr. Cheng's home. There are references in his diaries to four letters that Mr. Cheng writes to Mr. Gu Weihao. Nothing, by the way, coming from Gu Weihao to Mr. Cheng. We don't know the contents of those letters. The last one was February 10th of 2003. That's at ER 2168. I don't believe that occasional contact with a person over the 11 years after he retires amounts to an inference of direction or control. On this issue of proprietary, the term certainly has some significance in the sense that Boeing pays its people to pull information together. And so a proprietary document, that notion certainly has some significance to Boeing. My concern is that it not be blended with the notion of a trade secret. There is a distinction between documents that are proprietary and documents that are trade secret. It may well be that they may both be secret. We have a lot of e-mails back and forth between us about cases. They're all secret. Every now and then we have some national intelligence case where we have to lock the documents in a safe when we're not in the office, but we're allowed to show them to our staffs. Sometimes we get a case that's so secret. We had one that I recall where somebody flies out from Washington and she sits in the room with us and we get to read them. We take notes and then she takes our notes back to Washington with her. We can't even keep our notes. Different levels of secrecy. I agree. I think a document that is proprietary might run the gamut from being not secret at all to being something that they consider quite secret. But it is not by itself a trade secret. In fact, you can see that from this very case where there are 300,000 documents of which a great many of the government said, the Boeing engineers said were considered proprietary or company sensitive. Why wouldn't this be like when you and your adversary are both at the law library doing research? I guess in a big firm you're not in the same law library, but in a town with Solos you are. You're in the law library doing research and when the other guy goes to lunch, you go over and see what books he pulled down from the shelf and copy down the sites. Everything in the books he pulled down is in published reports, but his work getting the right materials is certainly an important work product that he intends to preserve in secrecy. It may be or it may not be, and I think that's why when I say the term proprietary covers a gamut of material, it does. It may cover secret material, secret in the sense of meant to remain in confidence, and it may cover material that nobody cares about. But it's not trade secret material. There were in this case just six trade secret documents, period. No more, no less. And I don't want the term proprietary to sort of gloss over the notion of what's trade secret and what's not. So you've used your time, but you may sum up briefly if you'd like. One last point that I wanted to make. Mr. Staples says if he's writing a book, why does he have these F-15 manuals? Why does he have the helicopter things? I don't have an answer for you, but here's the odd thing about it. Both of the examples that Mr. Staples gave are from back in the 60s and the early 70s. He didn't work on the F-15 after the 60s. He didn't work on helicopters after the early 70s. So he collected those documents five to seven to ten years before he had the first approach from the Chinese. Why did he collect them? I can't tell you, but there's no evidence to suggest that he gathered those documents to benefit the Chinese. And if he was gathering them back in the 60s and 70s for some reason apart from trying to benefit the Chinese, it's just as plausible that he continued to gather documents over the years without the intent to benefit the Chinese. Thank you, counsel. The case just argued is submitted, and we very much appreciate the thoughtful arguments that both of you gave today. And we will be adjourned for this morning's session. All rise. The court of this session is adjourned.
judges: Goodwin, Kleinfeld, Graber